UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
                                        :
FREDERICK MONROE,                       :
                                        :  05 Civ. 6704 (LAK)(JCF)
              Petitioner,               :
                                        :    REPORT AND
     -against-                          :  RECOMMENDATION
                                        :
ARTUS DALE, Superintendent,             :
Clinton Correctional Facility,          :
                                        :
              Respondent.               :
- - - - - - - - - - - - - - - - - - - -:

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

       Frederick Monroe brings this petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, challenging his conviction

following a jury trial in New York State Supreme Court, New York

County, for burglary, robbery, assault, and sexual abuse.  Mr.

Monroe argues that (1) he received ineffective assistance of trial

counsel; (2) he had a conflict of interest with his attorney and

was therefore denied his right to counsel; and (3) he was denied

the rights to due process and confrontation of the witnesses

against him.  For the reasons that follow, I recommend that the

petition be denied.

Background

     A.   The Seven Incidents

          1.   Allison Carter - October 29, 2000

       At around 3:00 p.m. on October 29, 2000, Allison Carter left

her 2nd floor apartment at 10 East 13th Street in Manhattan and saw

1

a man she later identified as Mr. Monroe ringing the doorbell of the apartment next to hers. (Tr. at 173-76).[1] Ms. Carter described him as a light-skinned black man, about 6'2" tall, muscularly built, wearing a Baha pullover jacket, faded jeans, glasses, and a floppy hat. (Tr. at 177). Mr. Monroe asked to check the apartment for water problems. (Tr. at 178). As Ms. Carter walked toward the kitchen, Mr. Monroe grabbed her from behind, held a pair of scissors and a knife to her throat, said he would kill her if she screamed or tried to move, and demanded money and jewelry. (Tr. at 180-82). As Mr. Monroe reached for a bag to carry the jewelry, Ms. Carter ran toward the front door, but Mr. Monroe got there first. (Tr. at 183-84). Ms. Carter hit the buzzer, yelling for help, but Mr. Monroe grabbed her from behind again, holding his hand over her mouth and choking her. (Tr. at 184). Ms. Carter bit Mr. Monroe's hand between the thumb and first finger. (Tr. at 184-85). He then released her and fled, and she called 911. (Tr. at 185).

Ms. Carter identified Mr. Monroe as her attacker in a line-up and she subsequently identified him in court. (Tr. at 191, 176). When Mr. Monroe was arrested, a detective noticed a bite mark on his right hand between the index finger and thumb. (Tr. at 505). In response to the detective's questioning, Mr. Monroe said that he had been bitten by a dog. (Tr. at 515).

---

[1] "Tr." refers to the trial transcript.

2

            2.    Hope Plasha - November 1, 2000

        At around 6:00 p.m. on November 1, 2000, as Hope Plasha entered 22 Grove Street, she saw a man she later identified as Mr. Monroe smoking in the vestibule.  (Tr. at 754-57).  Ms. Plasha described Mr. Monroe as 6' tall, muscular and stocky, and wearing round, wire-framed glasses, a baseball cap, a black puffy ski jacket, and khaki pants.  (Tr. at 756).  Mr. Monroe followed Ms. Plasha into the lobby, and after Ms. Plasha entered the elevator, Mr. Monroe said, "This is a stick-up."  (Tr. at 759-60).  He told her to face a back corner of the elevator and he took her purse and put it in the backpack he was carrying.  (Tr. at 761-62).  When Mr. Monroe exited the elevator, he instructed Ms. Plasha to stay inside.  (Tr. at 763, 766-67).  When she emerged from the elevator and left through the lobby, Ms. Plasha noticed a beer can in the corner of the vestibule.  (Tr. at 768).  She ran to the police station two blocks away.  (Tr. at 768).  Ms. Plasha identified Mr. Monroe as her attacker in a line-up and later identified him in court.  (Tr. at 772-74, 756).

        During the police investigation, detectives recovered the beer can found in the lobby and swabbed it for bodily fluids.  (Tr. at 593-98).  The DNA that was recovered matched a sample obtained from Mr. Monroe.  (Tr. at 830-33).[2]

---

        [2]    To be precise, tests showed that the DNA from the beer can could not have come from 99.99999999999 percent of the population other than Mr. Monroe.  (Tr. at 833).

In addition, two Metrocards were recovered from Mr. Monroe at the time of his arrest.  (Tr. at 662-63).  Dr. James Eastman of the New York City Transit Authority reviewed a record of usage for each card and determined that one had been purchased on October 5, 2000. (Tr. at 332-33).  Ms. Plasha recognized the stations where the card had been used as stops she had made up until the date of the robbery.  (Tr. at 775-78).  At trial, Mr. Monroe's counsel did not cross-examine Dr. Eastman or Ms. Plasha.  (Tr. at 334, 778).

### 3.  Elsie Lozada - November 10, 2000

At around 9:40 p.m. on November 10, 2000, Elsie Lozada entered 50 East 8th Street and saw a man she later identified as Mr. Monroe standing next to the elevator holding the door open.  (Tr. at 534, 537-39).  Ms. Lozada described Mr. Monroe as tall, with dark-colored skin, seemingly of mixed race, clean-looking, with very short, curly, reddish brown hair and no facial hair, wearing a long-sleeved, orange knit shirt and tan pants.  (Tr. at 537-38). When Ms. Lozada entered the elevator, Mr. Monroe grabbed her from behind.  (Tr. at 540-41).  He pushed the stop button on the elevator, bent his arm around Ms. Lozada's neck and squeezed, lifted her in the air, and demanded money and jewelry.  (Tr. at 540-41).  Ms. Lozada did not see a weapon but felt something in her back.  (Tr. at 546).  After Mr. Monroe fled, Ms. Lozada got off the elevator, went to her apartment, and called 911.  (Tr. at 545). She told the police that Mr. Monroe had placed a knife to her neck.

(Tr. at 560-61).

Later that same evening at the police precinct, Ms. Lozada noticed a wanted poster and told the detectives that the man who robbed her looked like the man depicted on the poster. (Tr. at 569, 571-73). Ms. Lozada later identified Mr. Monroe in a line-up as the man who took her money and jewelry, and she subsequently identified him in court. (Tr. at 549, 539).

### 4.   Rosemary Watt - November 12, 2000

At around 10:30 p.m. on November 12, 2000, Rosemary Watt arrived at the SouthGate Hotel on Seventh Avenue and Thirty-First Street. (Tr. at 723-24). After registering, Ms. Watt got on the elevator with three other people, including a man she later identified as Mr. Monroe. (Tr. at 724-25). Ms. Watt described Mr. Monroe as tall and very big, with blond, sandy-colored hair in tight curls, wearing khaki pants, a turtleneck, a green plaid shirt, and tan boots. (Tr. at 725-26). Mr. Monroe followed Ms. Watt to her room, took her key, pushed open the door, and shoved her inside. (Tr. at 726-30). He demanded cash and jewelry and forced Ms. Watt to write down the PIN number for her ATM card, telling her he would kill her if his partner called and told him the number was wrong. (Tr. at 734, 737). After binding and gagging Ms. Watt, Mr. Monroe left the room and had a conversation with another man. (Tr. at 739-40). When he returned, Mr. Monroe sexually assaulted Ms. Watt, putting his mouth on her breast and

his fingers in her vagina. (Tr. at 741). After Mr. Monroe had a conversation over the telephone, he left, and Ms. Watt freed herself and went to the lobby for help. (Tr. at 741-43). Ms. Watt identified Mr. Monroe as her attacker in a line-up, and thereafter she identified him in court. (Tr. at 749, 725).

Detectives recovered fingerprints from the hotel room, two of which matched Mr. Monroe's prints. (Tr. at 233-36, 714-15). DNA extracted from a swab of Ms. Watt's breast matched that recovered from the beer can found in the lobby of Ms. Plasha's building as well as a sample obtained from Mr. Monroe. (Tr. at 826-27, 830-34).

At trial, Mr. Monroe's counsel did not cross-examine Ms. Watt. (Tr. at 750).

### 5.  Jessica Bryden - November 16, 2000

At around 6:00 p.m. on November 16, 2000, Jessica Bryden entered 690 Greenwich Street and held the door open for a man she later identified as Mr. Monroe. (Tr. at 270, 276). Mr. Monroe followed her into the elevator, grabbed her from behind, held a knife to her throat, and told her to give him her jewelry and cash. (Tr. at 276, 279, 281). Ms. Bryden described Mr. Monroe as tall, with a medium build. (Tr. at 283). When Mr. Monroe took her bag and left, Ms. Bryden ran outside and flagged down a police car. (Tr. at 284-85). She identified Mr. Monroe as her attacker in a line-up and later identified him in court. (Tr. at 288-89, 274).

As discussed above, two Metrocards were recovered from Mr. Monroe at the time of his arrest. (Tr. at 662-63). The second one was purchased on November 5, 2000. (Tr. at 333-34). Ms. Bryden recognized the stations at which the card had been used as stops she had made prior to the date she was attacked. (Tr. at 775-78).

### 6. Dana Coleman - November 20, 2000

At around 8:00 p.m. on November 20, 2000, William Zedlovich answered a knock at the door of his tenth floor apartment at 312 East 23rd Street, and a man he later identified as Mr. Monroe asked for Julio. (Tr. at 144-45). Mr. Zedlovich described Mr. Monroe as an Hispanic-looking man with a scruffy beard. (Tr. at 147).

At around 8:30 p.m., Dana Coleman answered a knock at the door of her apartment on the tenth floor of the same building, and a man she subsequently identified as Mr. Monroe said the managing agent had sent him to check the faucets in her apartment. (Tr. at 65-66, 69-71). Ms. Coleman described Mr. Monroe as about 6' tall, weighing about 200 pounds, appearing to be white or Hispanic, with no facial hair and wearing a hat. (Tr. at 71, 90). After speaking with Mr. Monroe at the door to her apartment, Ms. Coleman's next memory was that she was standing in her bedroom doorway, with Mr. Monroe strangling her as he demanded money. (Tr. at 76). Ms. Coleman next remembered standing in the hallway looking down at her sweater soaked in blood. (Tr. at 76). She then recalled being in the hospital with her husband beside her. (Tr. at 76).

Mr. Zedlovich had remained in his apartment, and he called the police when he heard a woman screaming. (Tr. at 148). Mr. Zedlovich's roommate, David Griffiths, found Ms. Coleman on the floor near the door to their apartment, screaming and covered in blood. (Tr. at 61-62). Mr. Griffiths tended to Ms. Coleman until the police and ambulance arrived. (Tr. at 62, 148).

Both Ms. Coleman and Mr. Zedlovich identified Mr. Monroe in line-ups and also made in-court identifications. (Tr. at 78-79, 149-50, 71, 145).

### 7.  Koki Uneno - November 24, 2000

At around 6:45 p.m. on November 24, 2000, Koki Uneno was in the apartment of his aunt, Kazuko Hillyre, at One Lincoln Plaza, when a man he later identified as Mr. Monroe knocked on the door. (Tr. at 419-22). Mr. Uneno described the petitioner as a big, white man wearing a hat and hip hop style clothing. (Tr. at 421). Mr. Monroe asked to take a look inside the apartment because there was water leaking downstairs. (Tr. at 421). Mr. Uneno let Mr. Monroe in, and Mr. Monroe grabbed him from behind and told him to give him money and jewelry. (Tr. at 422-25). Mr. Monroe then handcuffed Mr. Uneno to a shower bar. (Tr. at 432, 434-35). After he heard Mr. Monroe leave, Mr. Uneno extricated himself and then waited about ten minutes before leaving the apartment. (Tr. at 435-37).

At around 7:00 p.m., Louis Regus, a doorman, began receiving

calls at the lobby desk that there was an intruder trying to gain entrance to apartments by posing as a maintenance worker. (Tr. at 447-48). Mr. Regus told another doorman, Thomas Emright, and a maintenance man, Raul Melendez, about the intruder and asked them to look upstairs; Mr. Regus also called the police. (Tr. at 448). Mr. Regus saw on the lobby monitor that someone he later identified as Mr. Monroe was in one of the elevators. (Tr. at 450-52). Mr. Regus asked Thomas Arias, an employee of the apartment health club, and Jose Rodriguez, a porter, to join him by the elevator, and when the doors opened, Mr. Regus asked Mr. Monroe to step aside and not to resist because the police were on their way. (Tr. at 451). Mr. Monroe began to run for the front door, but Mr. Emright, Mr. Regus, Mr. Arias, and Mr. Rodriguez pinned Mr. Monroe to the floor, and Mr. Regus again called 911. (Tr. at 452-53). Seeing Mr. Monroe reach toward his pocket, Mr. Rodriguez reached inside first and pulled out a knife and threw it to the floor. (Tr. at 468-69). The police arrived and handcuffed Mr. Monroe. (Tr. at 479). Mr. Uneno then arrived in the lobby and found Mr. Monroe being restrained. (Tr. at 437-38).

Fingerprints taken from the exterior side of the door to Ms. Hillyre's apartment and from the knife recovered from Mr. Monroe matched Mr. Monroe's prints. (Tr. at 251-57).

In court, Mr. Uneno identified Mr. Monroe as the man who robbed him, and Mr. Regus, Mr. Emright, and Mr. Melendez identified

the petitioner as the man they restrained in the lobby.  (Tr. at 421-22, 452, 465, 468).

Mr. Monroe's trial counsel did not cross-examine Mr. Uneno. (Tr. at 440).

B.    Procedural History

At the conclusion of Mr. Monroe's trial, the jury found him guilty of six counts of Burglary in the First Degree, two counts of Burglary in the Second Degree, three counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, two counts of Robbery in the Third Degree, one count of Assault in the First Degree, and three counts of Sexual Abuse in the First Degree.  (Tr. at 1015-19).  Mr. Monroe was sentenced, as a violent predicate felon, to an aggregate prison term of 155 years.  (S. at 11, 35).[3]

The petitioner appealed to the Appellate Division, First Department, on the grounds that (1) trial counsel provided ineffective assistance of counsel because (a) in summation, he conceded liability as to four of the seven incidents while providing no viable theory of mistaken identification with respect to the others and (b) he failed to object when the trial judge limited questioning of potential jurors during voir dire; and (2) his rights to due process and confrontation of the witnesses against him were violated by trial counsel's concessions in summation and by his failure to cross-examine witnesses, including

---

[3] "S." refers to the sentencing transcript.

three of the complainants. (Brief for Defendant-Appellant dated August 2003 ("Pet. App. Br."), attached as Exh. A to Appendix in Support of Memorandum in Opposition to Petition for a Writ of Habeas Corpus dated May 2006 ("Resp. App."), at 2). Mr. Monroe's conviction was affirmed by the Appellate Division on April 15, 2004. People v. Monroe, 6 A.D.3d 240, 774 N.Y.S.2d 334 (1st Dep't 2004).

The Appellate Division found that Mr. Monroe received effective assistance of counsel because he failed to demonstrate "the absence of strategic or other legitimate explanations" for counsel's conduct of the trial, and given the overwhelming evidence of the petitioner's guilt, counsel's strategy of concentrating his attack on those charges supported by the least evidence was reasonable under the circumstances. Id. at 240, 774 N.Y.S.2d at 334 (internal citations omitted). The Appellate Division also rejected Mr. Monroe's claim that his counsel's strategy constituted an abandonment of Mr. Monroe's right of confrontation. Id. at 240, 774 N.Y.S.2d at 334. Finally, the court found that any claim concerning the voir dire of prospective jurors was unpreserved and that, in any event, the trial judge's ruling was a proper exercise of discretion. Id. at 240, 774 N.Y.S.2d at 334. Leave to appeal to the New York Court of Appeals was denied on June 30, 2004. People v. Monroe, 3 N.Y.3d 644, 782 N.Y.S.2d 415 (2004).

On May 31, 2005, Mr. Monroe moved pro se to vacate the

judgment pursuant to New York Criminal Procedure Law ("CPL") sections 440.10 and 440.30 on the grounds that (1) he was denied effective assistance of trial counsel; (2) he had a conflict of interest with his attorney and was therefore denied his right to counsel; and (3) he was denied the rights to due process and confrontation of the witnesses against him. (Resp. App., Exh. E). Mr. Monroe's motion was denied on September 8, 2005 (Resp. App., Exh. G), and leave to appeal was denied on December 29, 2005. (Resp. App., Exh. H).

Mr. Monroe filed his habeas corpus petition on June 28, 2005.

Discussion[4]

---

[4] Prior to passage of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), factual findings made by a state court after an evidentiary hearing were presumed correct in a federal habeas proceeding, but federal courts were not required to defer to state court determinations of law and of mixed questions of law and fact. See Thompson v. Keohane, 516 U.S. 99, 107-12 (1995); Brown v. Artuz, 283 F.3d 492, 497 (2d Cir. 2002). Under the AEDPA, however, a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The AEDPA standard applies to this case since Mr. Monroe filed his petition after the Act's effective date. See Brown, 283 F.3d at 498 n.2. Nevertheless, since each of the petitioner's claims fails under the less deferential pre-AEDPA standard, there is no need to conduct the AEDPA's more intricate analysis. Cf. Kruelski v. Connecticut Superior Court for the Judicial District of Danbury, 316 F.3d 103, 106 (2d Cir. 2003) (suggesting, in post-AEDPA cases, that habeas courts assess first whether state court's ruling was erroneous under "correct interpretation" of the federal law at issue, then whether the ruling was unreasonable).

A. <u>Ineffective Assistance of Counsel</u>

To prevail on a Sixth Amendment ineffective assistance of counsel claim, the petitioner must establish that (1) counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.  When reviewing trial counsel's performance, a habeas corpus court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" <u>Id.</u> at 689.  The court must not rely upon hindsight to second-guess counsel's unsuccessful trial strategy.  <u>Id.</u>  The petitioner must also demonstrate that, but for the mistakes of counsel, there was a reasonable probability that he would have received a more favorable disposition than the one that ultimately resulted.  <u>Id.</u> at 694; <u>see also</u> <u>United States v. Cronic</u>, 466 U.S. 648, 657-58 (1984).  The "prejudice" prong of the test requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687.

1. <u>Voir Dire</u>

At the beginning of voir dire, both the prosecutor and Mr. Monroe's attorney questioned the first panel of prospective jurors

concerning their ability to view the seven incidents as separate cases, differentiate the evidence, and not allow their view of one case to affect their view of the others. (VD. at 170-95).[5] When voir dire continued the following day, the court addressed both trial attorneys and expressed her frustration with the way that these "spillover" questions had been framed the previous day. (VD. at 199). Instead of permitting the attorneys to continue the questioning, the trial judge herself explained the issue of spillover to the prospective jurors. (VD. at 205-06). Neither attorney objected to this procedure. (VD. at 199-208). Mr. Monroe now argues that his attorney's failure to do so constituted ineffective assistance.[6] However, since some prospective jurors in fact raised questions about their ability to be fair and unbiased due to spillover, it is evident that the court effectively communicated the issue, even if Mr. Monroe's attorney did not have the opportunity to pursue these questions himself. (VD. at 228, 272). Moreover, a trial court has broad discretion to determine the scope and nature of voir dire. See United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002). Therefore, trial counsel's failure

---

[5] "VD." refers to the transcript of the voir dire.

[6] As noted above, the Appellate Division considered any challenge to the trial court's ruling to be unpreserved. Monroe, 6 A.D.3d at 240, 774 N.Y.S.2d at 334. However, Mr. Monroe is now attacking not the ruling itself but his attorney's failure to object to it. Moreover, the respondent has not asserted that this claim is procedurally defaulted. Therefore it may be addressed on the merits.

to object to the prohibition on this line of questioning was not professionally unreasonable, particularly since the trial court's statements and questions to the jurors addressed this issue.

### 2. Summation

#### a. Inflammatory Remarks

The petitioner argues that the summation was deficient because his trial counsel began with "inflammatory" remarks to the effect that this was a "nasty," "ugly," and "very emotional" case. However, these statements formed part of trial counsel's strategy to acknowledge the difficulty of the case and remind the jury that it should not allow these aspects of the case to influence their ability to fairly consider the evidence in reaching a decision. As a tactical choice, this strategy was not professionally unreasonable. Additionally, the petitioner has failed to show prejudice resulting from his counsel's comments. See Strickland, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks and citation omitted).

#### b. Concession of Guilt

Next, the petitioner argues that his trial counsel conceded liability to four of the seven incidents, those involving Ms. Watt, Ms. Bryden, Ms. Plasha, and Mr. Uneno. Mr. Monroe also contends that trial counsel ignored arguments that made concession

unnecessary in connection with the incidents involving Ms. Watt and Ms. Bryden. The petitioner maintains that the presence of another man during Ms. Watt's attack suggests that this incident was distinct from the six other incidents, which all involved a single attacker. The petitioner also argues that the MetroCard and knife found at the time of his arrest, which connected him to the incident involving Ms. Bryden, are common items.

Concession of guilt, where it is strategically justified, does not constitute ineffective assistance of counsel. See Florida v. Nixon, 543 U.S. 175, 190 (2004); Frascone v. Duncan, No. 01 Civ. 5924, 2005 WL 1404791, at *2 (S.D.N.Y. June 14, 2005) (concession of guilt in non-capital case does not necessarily warrant finding of prejudice under Cronic; concession may be made without client's express consent). See also Musa v. Senkowski, Nos. 02-CV-6113, 03-MISC-0066, 2004 WL 502556, at *15-16 (E.D.N.Y. March 15, 2004) (petitioner failed to demonstrate his counsel was ineffective for conceding guilt because petitioner did not show counsel's performance fell outside wide range of professionally competent assistance under Strickland).

Trial counsel told the jurors at the beginning of summation that they would have to decide "whether or not there is a reasonable doubt in this case" and whether "the People have established their burden of proof as to every single victim here." (Tr. at 879). Trial counsel later urged the jury to "separate and

16

sift these seven cases by themselves." Further, he emphasized that even though "in terms of some of them you will find the evidence is pretty strong[,] [s]ome you might find are not so strong." (Tr. at 889-90). Mr. Monroe's attorney also asked the jury, "So, has his identity been established beyond a reasonable doubt as to each of the seven charges?" (Tr. at 890). Recognizing that the DNA, fingerprint, and MetroCard evidence in four of the incidents could not be rebutted, trial counsel's strategy to focus on the weakest of the prosecution's cases -- in an attempt to persuade the jurors that there was a question as to the petitioner's guilt as to these three incidents, which might then lead them to conclude that there was also reasonable doubt as to the other four incidents -- was a question of trial tactics and was professionally reasonable. Although Mr. Monroe argues that concession was unnecessary for the incidents involving Ms. Watt and Ms. Bryden, Ms. Watt's case involved DNA evidence and Ms. Bryden's case involved her identification of the knife and MetroCard found on Mr. Monroe at the time of his arrest. Therefore, trial counsel's concessions were not professionally unreasonable.

c. <u>Misidentification</u>

Third, Mr. Monroe argues that his trial attorney provided no viable theory of mistaken identification even though this was the only defense he advanced with respect to the remaining incidents. Specifically, the petitioner argues that for the incident involving

17

Ms. Carter, trial counsel drew attention both to Ms. Carter's identification of the petitioner and to her testimony concerning the bite mark on the petitioner's hand, thereby creating a link between them. However, trial counsel argued both that Ms. Carter's identification was weak and that it was the only evidence linking the petitioner to this incident. (Tr. at 891). Counsel's argument about the bite mark on the petitioner's hand was an attempt to raise doubt since Ms. Carter recalled biting the petitioner's left hand and the petitioner had a bite mark on his right hand at the time of arrest. (Tr. at 891-92).

Mr. Monroe contends that with regard to the incident involving Ms. Lozada, his trial attorney did not remind the jury that on the 911 tape Ms. Lozada claimed her attacker had used a knife and that Ms. Lozada's identification of the petitioner was influenced by the wanted poster she saw at the police precinct. However, trial counsel raised questions about Ms. Lozada's line-up identification. (Tr. at 893-94). Although trial counsel failed to make the additional arguments raised by the petitioner, his conduct was still competent and, given the overwhelming evidence in this case, it is impossible to find that the petitioner was prejudiced.

The petitioner next argues that his attorney failed to draw attention to the discrepancies between Ms. Coleman's and Mr. Zedlovich's descriptions of him. This allegation is not supported by the record. Trial counsel did argue that Ms. Coleman "gave

physical descriptions that are apparently conflicted by her neighbor, Mr. Zedlovich." (Tr. at 894).

Mr. Monroe also maintains that trial counsel failed to make arguments concerning misidentification in the case as a whole, by pointing out, for example, that the victims' varying descriptions of their assailant undermined the prosecution theory that there was a single perpetrator. But trial counsel told the jury "if you find any reasonable doubt in this case it will be on this question of identity." (Tr. at 880). Further, he asked the jury to consider whether there was mistaken identity based on various factors: the suggestiveness of in-court identification; the suggestiveness of the lineup; the inability of some witnesses to observe the events; the influence of physical factors such as lighting and distance at the time of each incident; and the impact of the wanted poster and media coverage. (Tr. at 881-85).

Finally, the petitioner asserts that his attorney failed to challenge the experience of Mr. Leach, the criminologist who testified concerning DNA testing. While trial counsel did not attack Mr. Leach's experience during summation, to do so would only have drawn further attention to the unrebutted DNA evidence. Accordingly, trial counsel's strategy was not professionally unreasonable.

Therefore, although trial counsel failed to advance some of the misidentification arguments that the petitioner raises, this

was a matter of trial tactics, and given the overwhelming evidence in this case, it has not been shown to have prejudiced the outcome of the trial.

B. <u>Conflict of Interest</u>

Mr. Monroe argues that because his trial counsel did not provide him with an adequate defense, he had a conflict with his attorney that denied him the right to counsel. The respondent does not directly address this claim.

An attorney has an actual conflict of interest "when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." <u>United States v. Jones</u>, 455 F.3d 134, 150 (2d Cir. 2006) (internal quotation marks and citations omitted). "The defendant's mere assertion, however, that his attorney is providing less than constitutionally effective assistance, which requires the attorney to defend his preparation and strategy, is not itself sufficient to create a divergence of the attorney's interests from those of the defendant." <u>Id.</u> In this case, the petitioner has failed to identify anything more than a disagreement with counsel over tactics and therefore has not demonstrated that there was a conflict of interest.

C. <u>Due Process and Confrontation</u>

The petitioner argues that his rights to due process and to confrontation of the witnesses against him were violated both by

20

trial counsel's concessions in summation and by counsel's failure to cross-examine witnesses, including three of the complainants and one expert. The respondent addressed this argument as part of the discussion of the ineffective assistance of counsel claim. Even if the confrontation clause is implicated here, trial counsel may waive a defendant's right to confrontation where the decision is one of trial strategy that might be considered sound. See United States v. Plitman, 194 F.3d 59, 64 (2d Cir. 1999). As discussed above, trial counsel's decision not to focus on four of the seven incidents was a matter of appropriate trial tactics.

The conduct of cross-examination is typically a question of trial strategy that habeas courts will not second-guess unless there is no tactical justification for the course taken. See United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Trial counsel's decision not to cross-examine the three complainants for whom there was DNA and fingerprint evidence, and Dr. Eastman, the MetroCard expert, formed part of trial counsel's strategy of focusing on the weakest parts of the prosecution's case, rather than reminding the jury of irrefutable scientific evidence. Therefore, trial counsel's decision not to cross-examine these witnesses was not a violation of the petitioner's confrontation rights.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Monroe's

petition for a writ of habeas corpus be denied.   Pursuant to 28

U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e)of the Federal Rules

of Civil Procedure, the parties shall have ten (10) days from this

date to file written objections to this Report and Recommendation.

Such objections shall be filed with the Clerk of the Court, with

extra copies delivered to the chambers of the Honorable Lewis A.

Kaplan, Room 1310, and to the chambers of the undersigned, Room

1960, 500 Pearl Street, New York, New York 10007.   Failure to file

timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          December 21, 2006

Copies mailed this date to:

Frederick Monroe
02-A-1334
Auburn Correctional Facility
135 State Street
Auburn, New York 13021

Deborah L. Morse, Esq.
Assistant District Attorney
One Hogan Place
New York, New York 10013

22